```
              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION
```

CIVIL ACTION NO. 1:16cv00620-WOB-KLL

CATHY BRYANT                                      PLAINTIFF

VS.                    **MEMORANDUM OPINION AND ORDER**

CENTRAL COMMUNITY HEALTH
BOARD, ET AL.                                     DEFENDANTS


This is an employment discrimination action in which plaintiff alleges gender discrimination and retaliation under both federal and Ohio law, intentional interference with a business relationship, and breach of contract.

This matter is before the Court on defendants' motion for judgment on the pleadings, motion to enforce settlement agreement, and motion for costs (Doc. 10), and plaintiff's motion to amend the complaint (Doc. 11).

The Court previously heard oral argument on these motions. Having reviewed the matter further, the Court now issues the following Memorandum Opinion and Order.

***Factual and Procedural Background***[1]

Central Community Health Board ("CCHB") is a private, non-profit community-based behavioral health organization that provides mental health and other services to residents of the Hamilton County/Greater Cincinnati area.

Plaintiff Cathy Bryant ("Bryant") was employed as a Case Manager at CCHB from 2006 until June 29, 2012, when she was terminated. (Compl. ¶ 17). CCHB's asserted reason for the termination was that Bryant failed to meet productivity requirements and engaged in threatening and intimidating conduct toward her co-workers.

Bryant filed a federal lawsuit against CCHB alleging gender and age discrimination, violation of the FMLA, and retaliation. *Bryant v. Central Community Health Board*, S.D. Ohio Case No. 13cv355. The case settled and was dismissed on April 10, 2015, with the parties executing a "Confidential Settlement Agreement and General Release." (Doc. 6-1). Because Bryant had alleged a claim under the Age Discrimination in Employment Act ("ADEA"), the settlement agreement was subject to a statutorily mandated seven-day revocation period, meaning that the agreement could not take effect until seven days after Bryant signed it. (*Id.* ¶ 7). Bryant

---

[1] To supplement this narrative, a timeline of key dates is attached.

signed the agreement on April 10, 2015, making it effective on April 17, 2015. (*Id.* at 6).

After her termination from CCHB, Bryant was hired by Talbert House[2], another Cincinnati non-profit organization that provides mental health and substance abuse services. (Compl. ¶ 19). To some extent, the client bases of CCHB and Talbert House overlap.

Bryant alleges that on or about April 1, 2015, she was transferred to a new department at Talbert House and assigned to work with individuals who were also CCHB clients. (Compl. ¶ 20). Bryant further alleges that, at a staff meeting that day, a CCHB employee named Bill Epps ("Epps") asked, "Why is she here?" Bryant's supervisor, Tommie Reid ("Reid") told Epps that Bryant was the new Employment Services Provider at Talbert House. (Compl. ¶ 21).

Bryant next alleges that, on April 9, 2015, Reid told her that CCHB did not want her working with their clients due to her lawsuit. (Compl. ¶ 23).

In the meantime, counsel for Bryant and CCHB were negotiating a settlement of her lawsuit. *See* Doc. 15-1 to 15-5. Bryant signed the Settlement Agreement on April 10, 2015. (Doc. 6-1 at 6).

---

[2] It is unclear when exactly Bryant was hired by Talbert House, but the record reflects that she worked there at least as early as November 14, 2014. *See* Doc. 12-4.

On April 14, 2015, CCHB Clinical Supervisor Martha Stephenson ("Stephenson") sent an email to a CCHB Case Manager, Lisa Brubaker ("Brubaker"), and a Hamilton County Adult Probation Officer, Amanda Gerding ("Gerding"), regarding concerns about Bryant taking a client out to lunch and sharing with her clinical information about her that had been discussed in staff meetings. (Doc. 12-5 at 2-3). Gerding and Brubaker responded with emails echoing these concerns and expressing alarm about the disclosure to clients of confidential treatment discussions by their case managers and probation officers. (*Id.*).

Stephenson forwarded this email chain to Reid, stating: "Please see the email exchange below regarding Cathy Bryant. We have concerns about her violating professional boundaries and possibly undermining clients' treatment processes. Please let us know how this will be addressed." (*Id.* at 1). Reid responded, "This matter will be handled internally. Thanks for bringing to our attention." (*Id.*).

Bryant alleges that she was notified of these concerns the same day, (Complaint ¶ 27), and the memorandum confirming her termination states that Bryant supplied a statement the next day, admitting that she took the client out to lunch. (Doc. 12-4).

4

Talbert House terminated Bryant's employment effective April 20, 2015.[3]

Bryant filed this lawsuit against CCHB and several of its managers on June 7, 2016, alleging: 1) Title VII gender and race discrimination; 2) discrimination and retaliation under O.R.C. § 4112; 3) intentional infliction of emotional distress; 4) retaliation under the ADA, FMLA, Title VII and Ohio law; 5) breach of express or implied contract; 6) respondeat superior; 7) age discrimination under the ADEA; 8) defamation[4]; and 9) interference with business relationship.

On October 19, 2016, defendants filed a Motion for Judgment on the Pleadings, Motion to Enforce Settlement Agreement, and Motion for Costs. (Doc. 10). Bryant has also filed a Motion for Leave to File a First Amended Complaint. (Doc. 11).

*Analysis*

**A. Are Bryant's Claims Barred by the Settlement Agreement?**

The Settlement Agreement in this matter is to be "construed and governed according to the laws of the State of Ohio." (Doc. 6-1 at 6). Under Ohio law, "[t]he intent of the parties is presumed

---

[3] Although Bryant originally alleged that her employment was terminated on April 15, 2015, in her motion to amend the complaint (Doc. 11), plaintiff states that the actual date of her termination from Talbert House was April 20, 2015, and the record so reflects. (Doc. 12-4).

[4] Plaintiff has withdrawn her defamation claim.

5

to reside in the language they chose to use in their agreement." *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996) (citation omitted).

The relevant portions of the Settlement Agreement are as follows:

- This Agreement is made as a compromise and settlement by and between Bryant and CCHB and is intended to be a complete and final settlement and resolution of the Lawsuit and all claims that are, or might have been, raised between the Parties, upon the terms and conditions set forth below.

- In consideration for the promises set forth herein, Bryant hereby irrevocably and unconditionally releases, acquits, and forever discharges CCHB from any and all charges, claims, liabilities . . . of any nature whatsoever . . . **through the Effective Date of this Agreement**.

- Bryant hereby acknowledges that she has specifically waived any rights under the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. § 621 *et seq.*, and that all provisions of the Older Worker Benefits Protection Act have been complied with, **including that this Agreement has been explained to her by her attorney**. Bryant also acknowledges that she has been advised in writing to consult with her attorney regarding whether she wishes to execute this Agreement.

- Bryant further acknowledges that she has consulted with her attorney regarding the meaning of this Agreement, that she has been given a period of twenty-one (21) days within which to consider this Agreement and that she hereby voluntarily and knowingly waives such twenty-one (21) day period. **Bryant understands that she may revoke this Agreement within seven (7) days from the date she signs it by giving written notice of such revocation to CCHB within such seven (7) day revocation period. This Settlement Agreement and Release shall not be effective for seven (7) days after the date on which she signs it, but unless so revoked, it shall automatically become effective.**

6

- The full and general release in paragraph 7 covers any and all claims described in this section, whether or not they are currently known or unknown, foreseen or unforeseen, and any and all damages and consequences arising from such claims, whether or not the extent of such damages or consequences are fully known to the Parties at this time.

- By signing this Agreement, Bryant agrees not to bring any suit or action in any court or administrative agency, to the extent permitted by law, against CCHB and/or any of the beneficiaries of this Agreement.

- Bryant warrants and agrees . . . [that] [s]he has carefully read this entire Agreement and understands all the terms of this Agreement, including the Release provisions set forth in paragraphs 7 through 11 above . . .

- **If a prospective of future employer requests an employment reference for Bryant**, CCHB shall provide a "neutral" reference (i.e., Bryant's employment dates, title of her last position held and salary, if authorized by Bryant), and shall not make any disparaging statements **regarding Bryant's employment with CCHB.**

(Doc. 6-1) (emphasis added).

The seven-day revocation period highlighted above is mandated by statute in order to procure a valid release of ADEA claims. *Oubre v. Entergy Operations, Inc.*, 118 S. Ct. 838, 842 (1998) ("The OWBPA governs the effect under federal law of waivers and releases on ADEA claims and incorporates no exceptions or qualifications.").

Thus, as the Settlement Agreement expressly states, it could not become effective until seven days after Bryant signed it, during which period she was free to revoke it for any reason.

7

Bryant signed the Agreement on April 10, 2105, so it was not effective until April 17, 2015.

However, as Bryant points out, the ADEA regulations provide that a waiver is not "knowing and voluntary" unless "the individual does not waive rights or claims that may arise after the date the waiver is **executed**." 29 C.F.R. § 1625.22(c)(1). Further, it "is the general rule in [the Sixth] [C]ircuit that an employee may not prospectively waive his or her rights under either Title VII of the ADEA." *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 584 (6th Cir. 1995).

Therefore, any claims premised on actions occurring before April 10, 2015, are barred by the Settlement Agreement, but claims premised on events after that date are not barred.[5]

This leaves a single contested event. Bryant alleges that the email that Martha Stephenson sent to Talbert House on April 14, 2015 — concerning Bryant having lunch with a client and allegedly improperly sharing confidential treatment information with her — was an act of retaliation by CCHB because of Bryant's lawsuit.

In *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997), the Supreme Court held that the term "employees" as used in Title VII's anti-

---

[5] While claims based on acts occurring before April 10, 2015 are barred, this does not "bar an employee from using the prior acts as background evidence in support of a timely claim." *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

8

retaliation provision includes former as well as current employees. *Id.* at 346. Thus, Bryant can bring a claim for retaliation against CCHB even though she was no longer its employee at the time of the alleged retaliation.

"To state a *prima* facie case of retaliation [under Title VII], a plaintiff must establish (1) that she engaged in protected activity; (2) that the exercise of protected activity was known to the defendant; (3) that the defendant took adverse action (which includes actions that would dissuade a reasonable worker from making or supporting a charge of discrimination); and (4) that there was a causal connection between the protected activity and such adverse action." *Taylor v. Donahoe*, 452 F. App'x 614, 620 (6th Cir. 2011) (citation omitted).

Plaintiff's allegations satisfy all four parts of this test. She engaged in protected activity by suing CCHB for discrimination, and CCHB obviously knew of the lawsuit. Plaintiff further alleges that CCHB sent the April 14, 2015, email in retaliation for her suing them in an effort to get her fired.

While an "adverse action" is typically something on par with a termination, demotion, or failure to hire, the Supreme Court has made it clear that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" under Title VII. *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

9

In *Morgan*, the Court dealt with the issue of the timeliness of Title VII claims, rejecting the use of the "continuing violation" theory to keep alive claims based on discrete acts that fall outside the limitations period. The Court distinguished discrete acts which are individually actionable, and acts which are not individually actionable but may be aggregated to support a hostile work environment claim. *Id.* at 113-15.

In giving examples of such "discrete" acts, the Court mentioned obvious ones such as termination, but it also found timely and actionable plaintiff's allegations that he had been "falsely accused of threatening a manager." *Id.* Such an accusation is analogous to CCHB's complaint to Talbert House that plaintiff had engaged in unethical conduct.

Further support for this conclusion is found in the Supreme Court's decision in *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006). There, the Court rejected the argument that Title VII's antidiscrimination and antiretaliation should be read *in pari materia*:

> [W]we conclude that Title VII's substantive provision and its antiretaliation provision are not coterminous. The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm. We therefore reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provisions and that have limited actionable retaliation to so-called "ultimate employment decisions."

> In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, **which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.**
>
> . . .
>
> We phrase the standard in general terms because the significance of any given act of retaliation will often depend on the particular circumstances. Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. . . . A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. . . **Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others.**

*Id.* at 67-69 (emphasis added).

Accepting Bryant's allegations as true, CCHB reported her conduct to Talbert House as a means of retaliating against her for suing CCHB and in an effort to get her fired from Talbert House. This falls within the Supreme Court's definition of a "discrete act" of retaliation that would deter a reasonable employee from filing claims against her former employer.

While CCHB makes persuasive arguments that it had valid reasons for expressing its concerns, at this stage the Court must accept Bryant's allegations as true.

### B. Are The Claims Otherwise Without Merit?

The Court will briefly address Bryant's other claims inasmuch as they could be based on the April 14, 2015 email.

First, Bryant's claims for gender and age discrimination fail to state a claim because CCHB was not Bryant's "employer" at the time any of these events occurred. As to the individual defendants, there is no individual liability under Title VII or the ADEA. *Wathen v. Gen., Elec. Co.*, 115 F.3d 400-404-05 (6th Cir. 1997). Although Ohio law allows for individual liability against supervisors, none of the individual CCHB defendants were Bryant's "supervisors" on April 14, 2015, because she was not employed by CCHB.

Next, the breach of contract claim fails because, read as a whole, the non-disparagement clause in the Settlement Agreement clearly is limited to the reference context. (Doc. 6-1 at 5). Bryant does not allege that Talbert House asked CCHB for a reference or that the allegedly disparaging email of April 14, 2015, mentioned Bryant's employment with CCHB.

Bryant's claim for intentional infliction of emotional distress fails because Ohio law requires conduct that goes "beyond all possible bounds of decency" and "was such that it can be considered as utterly intolerable in a civilized community." *Bennett v. Columbiana County Coroner*, No. 14CO0039, 2016 WL 5874635, at *13 (Ohio Ct. App. Sept. 30, 2016) (citation omitted). The actions Bryant alleges that CCHB took do not approach this stringent standard. *See Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 544 (6th Cir. 2003) (applying Ohio law and rejecting claim

12

for intentional infliction of emotional distress where plaintiff alleged that former employer, knowing of plaintiff's heart condition, gave negative reference to potential employer).

Finally, Bryant alleges a claim for interference with business relationship under Ohio law. In order to demonstrate the elements of this claim, a plaintiff must show (1) a business relationship, (2) the tortfeasor's knowledge of the relationship, (3) intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom. *LaBarge v. Werner Enter.*, No. 2:07-cv-177, 2008 WL 2740831, at *7 (S.D. Ohio July 10, 2008) (citation omitted).

Ohio law recognizes a qualified privilege for statements between individuals with a common business interest. *Smith v. Ameriflora 1992, Inc.*, 644 N.E.2d 1038, 1043 (Ohio Ct. App. 1994). In order to overcome this privilege, a plaintiff must show that the alleged tortfeasor acted with actual malice. *Id.* To show actual malice, the plaintiff must prove that the tortfeasor made the statements in question with knowledge that they were false or with reckless disregard as to their truth or falsity. *Id.* at 1042.

Construing Bryant's allegations as true, she has sufficiently pled a claim for this tort. She alleges that CCHB deliberately, and with malice, sent the email on April 14, 2015, in order to get her fired from Talbert House. While Bryant admitted taking the client to lunch, she does not concede that she violated any ethical

13

duties, and her position is that her actions were consistent with Talbert House's policies.

At this early pleading stage, therefore, CCHB is not entitled to judgment on the pleadings on the interference with business relations claim.

In summary, Bryant's claims for retaliation and interference with business relations based on the April 14, 2015 email are not barred by the Settlement Agreement and may proceed.

The Court declines to award costs in this matter.

Therefore, having reviewed this matter, and being otherwise advised,

**IT IS ORDERED** that:

(1) Defendants' motion for judgment on the pleadings, motion to enforce settlement agreement, and motion for costs (Doc. 10) be, and is hereby, **GRANTED IN PART AND DENIED IN PART**, consistent with the above discussion;

(2) Plaintiff's motion to amend the complaint (Doc. 11) be, and is hereby, **GRANTED**. The tendered Amended Complaint is deemed **FILED** herewith; and

(3) The parties shall confer with the assigned United States Magistrate Judge regarding any amendments to the current discovery schedule.

This 29th day of March, 2017.



15

**Timeline**

| | |
|---|---|
| June 29, 2012 | Bryant terminated from CCHB |
| May 24, 2013 | Bryant files federal lawsuit against CCHB alleging gender and age discrimination, violation of the FMLA, and retaliation. |
| April 1, 2015 | Bryant, then employed at Talbert House, is assigned to a department where she would work with individuals who were also CCHB clients. CCHB employee Bill Epps allegedly says, "Why is she here?" Bryant's supervisor, Tommie Reid ("Reid"), tells Epps that Bryant is their new Employment Services Provider. |
| April 9, 2015 | Reid tells Bryant that CCHB does not want her working with their clients due to her lawsuit. |
| April 10, 2015 | Bryant signs Settlement Agreement to resolve her lawsuit against CCHB. Agreement contains ADEA-required 7-day revocation period, states that Agreement not effective until period expires. |
| April 14, 2015 | CCHB supervisors and Hamilton County Probation Officer email Reid at Talbert House with concerns about Bryant taking a client out to lunch and sharing confidential treatment information with her. Reid notified Bryant of this matter the same day. |
| April 15, 2015 | Bryant provides written statement to Reid admitting that she did take the CCHB/Talbert House client to lunch. |
| April 20, 2015 | Talbert House terminates Bryant's employment. |